58

ELSIE STEVENS STANSBURY, Plaintiff-Appellant, *v.* HOME STATE BANK OF CRYSTAL LAKE, Trustee, *et al.*, Defendants-Appellees.

Second District (2nd Division)   No. 75-421

Opinion filed September 28, 1976.

Richard J. Stevens and Peter N. Todhunter, both of Todhunter & Stevens, of Chicago, and James P. Hecht, of Woodstock, for appellant.

James E. Berner, of Caldwell, Berner & Caldwell, of Woodstock, Zukowski, Zukowski, Poper & Rogers, of Crystal Lake, and Keck, Cushman, Mahin & Cate, of Chicago, for appellees.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:
Plaintiff, Elsie Stevens Stansbury (Elsie), sought in Count I of her second amended complaint (Complaint) to establish a constructive trust as to the Delmar Stock Farm in Crystal Lake as well as to 2440 shares of

Hart, Schaffner & Marx preferred stock all of which was conveyed and transferred by her sister-in-law, Marjorie Stevens (Marjorie), prior to her death to the defendant, Home State Bank of Crystal Lake, as trustee (Home Bank). In Count II of the Complaint Elsie alleged breach of an oral contract to make a will leaving the farm and stock to her or her children, and asked that defendant Home Bank be ordered to transfer those assets to Elsie. The circuit court of McHenry County granted the motion of Lenora B. Stuck, administrator of the estate of Charles J. Stuck, deceased, to dismiss Count I under section 48 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 48), on the ground that the cause of action was barred by laches and the statute of limitations, and to dismiss Count II under section 45 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 45) on the ground that it failed to state a cause of action, in that it did not allege sufficient facts "to show clearly and unequivocally a contract between Elsie and Marjorie, whereby Marjorie agreed to make a will in favor of Elsie." Plaintiff appeals.

Essential to a determination of the propriety of the dismissal is a detailed analysis of the Complaint, all properly pleaded facts of which are taken as admitted by the motion to dismiss. *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 554.

Count I alleged that plaintiff, Elsie, and her older brother, Delmar A. Stevens (Delmar), were the only heirs of their mother, Mary E. Stevens, a widow, who died intestate on April 5, 1934. Elsie's husband, Ralph, died prior thereto, leaving an insolvent estate. Elsie had two children, Thomas, who at that time was seven years old, and Lois, who at that time was less than one year old. Elsie's brother, Delmar, was vice-president (and a director) of Chas. A. Stevens & Co. He was the husband of Marjorie. When Thomas A. Stevens, Elsie's and Delmar's father, died in 1919, and thereafter, Delmar was relied upon by both Elsie and her mother, Mary, "for advice and guidance as to the family assets." Delmar frequently received Elsie's proxies to represent her and "to elect Delmar to the Board of Directors of Chas. A. Stevens & Co. as a representative of the family interest." Delmar also employed Elsie at a salary commencing at $25 a week as a buyer in one of the departments of that company at a time when jobs were scarce and she needed the job to maintain herself and her children.

When Elsie's and Delmar's mother died in April, 1934, Elsie "permitted Delmar * * * to act as sole administrator" of her mother's estate in the probate court of Cook County instead of doing so herself or acting as co-administrator. In the mother's estate there was included (1) 692 shares of stock of Chas. A. Stevens & Co., (2) the Delmar Stock Farm in Crystal Lake and (3) a Chicago residence on South Shore Drive. Delmar continued to act as administrator of that estate from April 24, 1934, until

March 16, 1945. He managed the stock farm, leased it, collected the rents, paid taxes and insurance and made improvements, all without objection by Elsie, or demands by her that he close the estate.

The Complaint further alleged that, by reason of the foregoing facts, "[a] confidential and fiduciary relationship existed between Delmar * * * and Elsie * * * whereby Delmar * * * stood in a superior position and Elsie * * * reposed trust and confidence in him," and that Delmar abused that relationship "by making an unequal distribution" of their mother Mary's estate, under the following circumstances: Delmar called Elsie to a meeting on February 2, 1945, in the office of Oscar Stern, his attorney in their mother's probate estate. Delmar and Mr. Stern represented to Elsie that to close and settle the estate "it was necessary that Delmar receive title to the Delmar Stock Farm" and for Elsie to "receive title to the" Chicago residence. At that meeting Mr. Stern had appraisals of the farm and the residence which Delmar had obtained. The appraisals showed that the fair market value of the farm, which was stated by the appraiser to be "conservative," was $24,000, and the fair market value of the Chicago residence was $12,500. When Elsie stated that this disposition would give Delmar "an unfair advantage," Delmar promised that if Elsie agreed to that division she "or her children would receive the Delmar Stock Farm and the 346 shares of Chas. A. Stevens & Co. which Delmar received from the estate * * *, upon the death of Delmar and his wife, Marjorie." (Delmar's last will which he had executed in February, 1934, and which was in effect on his death in 1959, would have fulfilled that promise if he had continued to own the property.) Elsie said she would accept that division of the real estate and rely on Delmar's promise "as long as Delmar's wife, Marjorie, * * * was informed and consented to it." Approximately three weeks later Delmar told Elsie that his wife, Marjorie, "was informed of Delmar's promise and consented to it." Elsie then executed a quitclaim deed conveying the Delmar Stock Farm to Delmar on February 24, 1945, and on the same day Delmar and his wife, Marjorie, executed the deed conveying the Chicago residence to Elsie.

The Complaint further alleged that in 1955 "[l]awsuits of creditors were filed against Delmar," and by quitclaim deed dated December 3, 1955, recorded February 7, 1956, Delmar conveyed the farm to his wife, Marjorie, "without consideration," and on May 1, 1956, he transferred 104 1/6 shares of Chas. A. Stevens & Co. stock to Marjorie "without consideration." On March 5, 1959, Delmar died leaving a last will and testament dated February 13, 1934. (A copy of his will is attached to the complaint. Insofar as relevant here, Delmar's will devised and bequeathed all of his estate to his wife, Marjorie, "for her life or during her widowhood," and "upon her death thereafter not having remarried * * * to my * * * sister, Elsie.") During the course of the probate

proceedings in McHenry County, Marjorie, as administrator with will annexed of Delmar's estate, filed a petition executed May 17, 1961, asking authority to sell all 287 shares of Chas. A. Stevens & Co. stock which were inventoried in that estate, in order to pay expenses of administration. "After a conference between the attorney for the estate and Thomas A. Stansbury" (Elsie's son, who by then was a lawyer), "242 shares * * * were preserved in the estate, so that Marjorie * * * received a life interest therein with remainder on her death to" Elsie; those 242 shares and the 104 1/6th shares held by Marjorie "equal the 346 shares which Delmar * * * had promised to cause to be transferred to [Elsie] on the death of the survivor of Delmar and his wife, Marjorie."

In March, 1969, as a result of negotiations between Chas. A. Stevens & Co. and Hart, Schaffner & Marx, the 104 1/6th shares of Chas. A. Stevens & Co. stock were exchanged for 2440 shares of Hart, Schaffner & Marx Series A Cumulative Convertible Preferred Stock.

Early in 1971, Marjorie executed a trust agreement known as Trust No. 1425 naming defendant, Home Bank, as trustee, and by deed in trust dated March 25, 1971, recorded April 6, 1971, conveyed to the trustee title to the Delmar Stock Farm, and also transferred to the trustee the 2440 shares of Hart, Schaffner & Marx stock, and certain other assets not relevant here.

Elsie alleged that she did not see a copy of the trust agreement between Marjorie and the trustee until after Marjorie died on July 25, 1971, and that until then Elsie "believed that the trust agreement of March 25, 1971, carried out the promise of February 2, 1945." The trust agreement did not carry out that promise but disposed of the farm and the stock otherwise. A copy of the trust agreement is attached to the Complaint. Clause C of Article III thereof provides that upon the death of the donor (Marjorie) the trustee "shall distribute" to Charles J. Stuck $3,000 "along with the farm on which the Donor resides" (*i.e.*, the Delmar Stock Farm); other clauses of Article III provided for distributions to other defendants named in the Complaint. Under Article I of that trust agreement Marjorie retained the power during her lifetime to "modify and amend" the trust agreement and "to terminate the trust * * * in whole or in part."

The original complaint was filed on November 1, 1971. Charles J. Stuck who was included as one of the defendants, died on July 22, 1972, and Lenora B. Stuck was joined in his stead as administrator of Charles J. Stuck's estate.

Count II realleged most of the allegations of Count I and alleged further that at the meeting on February 2, 1945, in Mr. Stern's office at which Delmar, Mr. Stern and Elsie were present, Delmar offered, in consideration of Elsie's agreement to convey her interest in the farm to him, that Delmar and Marjorie would convey the Chicago residence and

cause the farm to be devised, and the shares of stock to be bequeathed, to Elsie or her children on the death of the survivor of Delmar and Marjorie; that plaintiff accepted said offer on condition that Marjorie agree to it; that within three weeks Delmar informed Elsie that Marjorie "agreed to the oral agreement," and that on February 24, 1945, the respective deeds were executed by Elsie to Delmar of the farm, and by Delmar and Marjorie to Elsie of the Chicago residence. Count II alleged further that Elsie believed Marjorie would carry out the agreement, and that Delmar's transfer of 104 1/6th shares of Chas. A. Stevens & Co., and the conveyance of the farm to Marjorie, and the fact that Marjorie did not cause the shares and farm to be transferred to Elsie or her children constituted a breach of the February 2, 1945, agreement. Elsie, therefore, asked the court to direct the defendant Home Bank, as trustee, to convey and transfer to Elsie the farm and stock.

Defendant Home Bank, as trustee, and the Lighthouse for the Blind of Metropolitan Chicago, filed motions, which this court allowed, to join in and adopt the appellee's brief filed in this court by Lenora B. Stuck, administrator of the estate of Charles J. Stuck, deceased.

The first question presented is whether Count I is barred by laches and the five-year statute of limitations (Ill. Rev. Stat. 1973, ch. 83, par. 16). The trial court in granting the motion to dismiss Count I held that it was barred because Elsie's cause of action accrued either in February, 1956 (when Delmar's deed to Marjorie of the farm was recorded), or in 1959, after Delmar's death (when Elsie, as a party to the probate proceeding involving Delmar's decedent estate, must have been aware of the omission of the farm from the inventory filed therein).

Before considering that question we should note that our detailed analysis of the allegations of Count I establishes that there are sufficient facts alleged to invoke relief under the theory of constructive trust imposed upon the farm and the 2440 shares of Hart, Schaffner & Marx stock (which resulted from the exchange of 104 1/6th shares of Chas. A. Stevens & Co.). In doing so, we bear in mind that upon motion to dismiss we consider the factual allegations to determine not the probability but only the possibility of recovery. *Neurauter v. Reiner* (1969), 117 Ill. App. 2d 141.

The promise, supported by the representations which Delmar made to Elsie in February, 1945, upon which Elsie's theory of constructive trust is based, was that Elsie or her children would receive the farm and the 346 shares of Chas. A. Stevens & Co. stock upon the death of Delmar and Marjorie, in consideration of her conveyance to him of the more valuable farm property. Delmar told Elsie that his wife, Marjorie, consented to that agreement, and Marjorie then joined Delmar in the deed of the Chicago residence to Elsie.

Delmar's December, 1955, conveyance to Marjorie of the farm (recorded in February, 1956) does not in and of itself constitute a repudiation of that agreement. The allegations are that that conveyance was made by Delmar because of suits filed by various creditors against him. The conveyance can be construed as an attempt by Delmar to preserve the farm and protect it from creditors so as to enable the agreement with Elsie to be carried out. Moreover, under that agreement Marjorie was entitled to the farm until her death, and Delmar's conveyance of title to her under the circumstances alleged does not constitute repudiation. Marjorie could have still fulfilled the agreement. Therefore, Elsie's knowledge, either by virtue of the recordation of that deed to the farm or the omission of the farm from the 1959 inventory in the probate proceedings of Delmar's decedent estate, that he had conveyed the farm to Marjorie, did not constitute notice to Elsie of any repudiation or of the accrual to her of a cause of action.

On the contrary, the allegation that in that probate proceeding, after Marjorie had petitioned for authority to sell all 287 shares of Chas. A. Stevens & Co. stock, a conference between the attorneys for Delmar's estate and Thomas Stansbury (Elsie's son—an attorney), resulted in the sale of only 45 of those shares, appears to indicate a recognition and acknowledgement by Marjorie of the agreement. The sale of only 45 shares resulted in the retention in Delmar's estate of 242 shares of that stock. Those, under Delmar's 1934 will, would go to Elsie or her children upon Marjorie's death. That block of 242 shares and the 104 1/6th shares which Delmar transferred to Marjorie in 1955 when creditors were filing suit against him are equal (except for one-sixth share) to the 346 shares which, Elsie alleged, Delmar had agreed to transfer to Elsie upon the death of Delmar and Marjorie.

We need not be concerned about Marjorie's 1971 conveyance to defendant Home Bank, of title to the farm by deed in trust, recorded in April, 1971, as constituting a repudiation and giving rise to a cause of action. Marjorie died some 3 months later, July 25, 1971, and Elsie's suit was filed in November, 1971, after she learned for the first time that the trust agreement did not carry out the promise to Elsie. No cause of action having accrued to Elsie until her discovery of the repudiation of the promise some three months before she filed this suit, Count I was not barred either by laches nor the statute of limitations, and there were sufficient facts alleged to invoke relief under the theory of constructive trust. *Neurauter v. Reiner* (1969), 117 Ill. App. 2d 141, 149; *McCartney v. McCartney* (1956), 8 Ill. 2d 494, 500.

We now consider the sufficiency of the allegations of Count II to state a cause of action. While it is true that courts accept with caution evidence offered in support of a contract to dispose of property by will (*Jatcko v.*

64

*Hoppe* (1955), 7 Ill. 2d 479, 484), we are not, upon motion to dismiss this count, concerned with the probability of plaintiff's ability to establish such contract by clear, definite and unequivocal terms, but merely with the possibility based on the plaintiff's factual allegations (*Neurauter v. Reiner* (1969), 117 Ill. App. 2d 141, 146), and we must accept as true all properly pleaded facts. *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 554.

Count II alleges that Elsie accepted Delmar's offer of February 2, 1945, to will the property in question to her "or her children on the death of the survivor" of Delmar and Marjorie "upon the condition that Marjorie be informed of it and agree to it"; and that within three weeks Delmar informed Elsie that Marjorie had so agreed. As we noted in our consideration of the allegations of Count I, Marjorie's action, during the administration of Delmar's estate, in selling only 45 shares of Chas. A. Stevens & Co. stock and preserving 242 shares of those shares indicated a recognition by Marjorie of the effectiveness of Delmar's agreement. We therefore hold that Count II stated a cause of action and that the trial court erred in dismissing both Counts I and II of plaintiff's second amended complaint.

Therefore, the judgment of the circuit court of McHenry County is reversed and the cause is remanded for further proceedings.

Reversed and remanded.

T. J. MORAN, P. J., and DIXON, J., concur.